UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

| KAREN RIGHTER-MALESKO, | : | Case No. 3:18-cv-00126 |
|---|---|---|
| Plaintiff, | : | |
| vs. | : | District Judge Walter H. Rice |
| | : | Magistrate Judge Sharon L. Ovington |
| COMMISSIONER OF THE SOCIAL SECURITY ADMINISTRATION, | : | |
| Defendant. | : | |

# REPORT AND RECOMMENDATIONS[1]

## I.  Introduction

The Social Security Administration provides Supplemental Security Income to individuals with a "disability" (among other eligibility requirements). *Bowen v. City of New York,* 476 U.S. 467, 470 (1986); *see* 42 U.S.C. § 1382(a).  A "disability" in this context means "any medically determinable physical or mental impairment" that precludes an applicant from performing a significant paid job ("substantial gainful activity").  42 U.S.C. § 1382c(a)(3)(A); *see Bowen,* 476 U.S. at 469-70.

Plaintiff Karen Righter-Milesko suffers from bipolar disorder and other health problems.  She applied for Supplemental Security Income in February 2013. Administrative Law Judge Gregory G. Kenyon denied her application on two occasions both times finding Plaintiff is not under a "disability."  The Social Security

---

[1] Attached is a NOTICE to the parties regarding objections to this Report and Recommendations.

Administration's Appeals Council found several flaws in ALJ Kenyon's first decision and, consequently, vacated and remanded it with instructions.

In the present case, Plaintiff challenges the decision ALJ Kenyon issued—again finding her not disabled—upon remand. She argues that (1) the ALJ unreasonably weighed the opinions of her four treating physicians and the opinions of the reviewing consultants, and (2) presented an incomplete hypothetical to a vocational expert upon whom he relied to support his non-disability decision. (Doc. #7, *PageID* #2144).

The Commissioner argues that the ALJ reasonably weighed the medical-opinion evidence and the ALJ's hypothetical question was not reversible error.

## II.     Background

Plaintiff was forty-eight years old when she applied for Supplemental Security Income (in February 2013). She was therefore considered a "younger person" under social-security regulations. *See* 20 C.F.R. § 416.963(c). She later moved into the regulation's category of a "person closely approaching advanced age." *Id*. at § 416.963(d). ALJ Kenyon found that Plaintiff had a high-school education, at a minimum. Plaintiff testified that she held a bachelor's degree in history. *Id*. at 71.

Plaintiff testified during administrative hearings that she has had bipolar disorder since she was twenty-four years old "and it's always been severe." (Doc. #5, *PageID* #75). She explained, "I was able to work for my parents…, so they had—I had unlimited sick leave, basically…." *Id*. She described this job as "very special in that they didn't fire me for the months I was out sick with bipolar illness…." *Id*. at 89. She continued, "I

think it's really realistic that I don't have more than two good hours a day on top of the tasks of daily living to try to make my way." *Id*. at 89-90.

Plaintiff suffers from mood swings from mania to depression. She has been psychiatrically hospitalized (four times, she recalls). *Id*. at 75-76. During a manic phase, she cannot sleep and becomes very irritable. *Id*. at 1144-45. She has "ranting spells…" and "probably [has] a meltdown every damn day." *Id*. at 1148. She explained, "I can rant and yell … probably about 6:00 [p.m.] almost every single day, because it's, that's about my day, I get up and—about when you need to wash dishes, cook dinner and, you know…." *Id*.

When depressed, she has "had a lot of suicidal thoughts," up to four times per day. *Id*. at 76. Other symptoms include a combination of "self-hatred, loathing, cussing around the house, [and] crying a lot." *Id*. During phases where her mental-health symptoms are out of control, she tends to isolate herself. *Id*. at 80-81.

She can generally take care of her own needs: She does her own laundry, cooking, shopping, and house cleaning. Yet, she explained, "I can manage to do those things when I'm well. I mean there's a big difference when I'm not well, I'm a mess." *Id*. at 81-82. If she is really depressed, she struggles "to do things that will make [her] stay alive…." *Id*. at 85.

Plaintiff will spend down times with her sister due to her fear of self-harm. *Id*. at 86. Her medications have been altered many times "[b]ecause they haven't been successful…." *Id*. at 86.

Plaintiff testified that her physical health problems include mild neuropathy in her

feet. *Id*. at 72. They hurt "from the moment [she] gets up in the morning until the time [she] goes to bed at night…." *Id*. at 73. She can't stand for more than forty-five minutes at a time, and she does not walk for more than twenty minutes at a time. Her foot pain is accompanied by coldness and numbness but not swelling. *Id*. at 87.

Plaintiff stated that she has been diagnosed with Multiple Sclerosis. *Id*. at 73, 1138. It has caused occipital neuralgia which affects her vision. *Id*. It also causes neurological symptoms on her left side, limits her ability to use her hands, and makes her feet tingle. *Id*. at 74, 1139-41, 1143. She struggles with cognition and word finding. *Id*. at 1141-43.

Plaintiff's hobby is acting at a community playhouse theatre. When the ALJ asked her how long she had been doing that, she testified:

> [T]he bipolar illness is bad for a while and then you get a time when it's not so bad. And then maybe you can do something with your life for a while. And something like theatre is short-term commitment and I do have abilities in that sense so I can do it.

*Id*. at 79. When she played a lead role (Anna in The King and I) she became sick. She explained, "I had a manic episode at the end of that show and missed three performances because it was a very long rehearsal period and kind of a—there's sort of, you know, pettiness and drama and stress that goes along with even doing something like a hobby. And you've got to cope with it, and I don't cope very well…. Because I am more sensitive than most people." *Id*. at 79.

During an ordinary day, she gets up around 8:30, does Pilates exercises, eats, bathes, and gets dressed. Plaintiff is a writer. If she has any creative energy or initiative

4

she'll "work on some writing…." *Id*. at 83. She explained, "But with the depression it's… hard to focus and it's hard—if you're blank and you haven't got any focus then you've got to find something else to do. And I do some other things with the—I check the email…." *Id*. at 83-84. She also volunteered with a committee that was trying to organize a group of business people to meet and provide cooperative businesses for low-income people. They would meet once a week, and she sent them emails and reminders. She was also the treasurer for her church, but it did not work out. Indeed, neither activity appears to have worked out. She testified, "it wasn't working out very well and I started waking up early in the morning, like 3:00 a.m. and I had problems with the committee and its ethical direction." *Id*. at 84.

Plaintiff went grocery shopping (she did not say how often) and she usually cooked dinner. Once during the week, she would see her boyfriend. She explained, "And I guess it doesn't sound like a lot, but … it's a lot." *Id*. When the ALJ asked Plaintiff why she thought she could not work full time, she answered, "Because doing those little things is a full-time job for me. And I wish it wasn't but it is…. It uses up what I have for a day…. [I]f things are going really well for me, then I might be able to do two hours for four or five days a week of a project, or a writing project, or … acting …." *Id*. at 84-85.

As to the medical evidence, the Commissioner incorporates the ALJ's recitation of the facts in his decision, and the Commissioner describes the medical information and opinions. (Doc. #9, *PageID* #s 2162, 2166-73). Plaintiff has likewise discussed the medical evidence in detail. (Doc. #6, *PageID* #s 2137-43). Rather than repeat these

5

reviews of the medical evidence, the pertinent evidence will be discussed below, *infra*, §
IV.

## III. Standard of Review and ALJ Kenyon's Decision

Review of ALJ Kenyon's most-recent decision considers whether he applied the correct legal standards and whether substantial evidence supports his findings. *Blakley v. Comm'r of Soc. Sec.*, 581 F.3d 399, 406 (6th Cir. 2009); *see Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 745-46 (6th Cir. 2007). Substantial evidence consists of "more than a scintilla of evidence but less than a preponderance...." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007); *see Lawson v. Comm'r of Soc. Sec.*, 3:17cv119, 2018 WL 3301421, at *4 (S.D. Ohio 2018) (Ovington, M.J.), *Report & Recommendations adopted*, 2018 WL 3549787, at *1 (S.D. Ohio 2018) (Rice, D.J.).

The ALJ considered the evidence and evaluated Plaintiff's disability assertions under each of the five sequential steps set forth in the Social Security Regulations. *See* 20 C.F.R. § 416.920. His more pertinent findings began at step two where he found that Plaintiff had numerous severe impairments: history of neuromas affecting her feet, degenerative disc disease of the cervical spine, Multiple Sclerosis, left-shoulder tendonitis, diminished peripheral vision in her left eye, and bipolar disorder. At step three, the ALJ concluded that Plaintiff's impairments did not automatically qualify her for benefits. (Doc. #5, *PageID* #s 1108-11).

At step four, the ALJ concluded that the most Plaintiff could do (her "residual functional capacity," *see Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 239 (6th Cir. 2002)), consists of "light work" with 10 specific limitations—for example, "(1)

6

occasional crouching, crawling, kneeling, stooping, and climbing of ramps and stairs…; (7) limited to performing unskilled, simple, repetitive tasks; (8) occasional contact with coworkers, supervisors and the public; (9) no fast pace production work or jobs involving strict production quotas; (10) limited to performing jobs in which there is little, if any, change in the job duties or the work routine from one day to the next." *Id*. at 1111.

The ALJ found at step five that Plaintiff retained the ability to perform a significant number of jobs that exist in the national economy. These main findings led the ALJ to ultimately conclude that Plaintiff was not under a benefits-qualifying disability. *Id.* at 1121-22.

## IV. Discussion

### A. <u>Treating Medical-Source Opinions</u>

Social Security Regulations require ALJs to adhere to certain standards when weighing medical opinions. "Key among these is that greater deference is generally given to the opinions of treating physicians than to those of non-treating physicians, commonly known as the treating physician rule." *Rogers,* 486 F.3d at 242 (citations omitted). The rule is straightforward:

> Treating-source opinions must be given "controlling weight" if two conditions are met: (1) the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and (2) the opinion "is not inconsistent with the other substantial evidence in [the] case record."

*Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013) (quoting in part 20 C.F.R. § 404.1527(c)(2) ); *Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 723 (6th Cir. 2014). If the treating medical source's opinion is not controlling, "the ALJ, in

7

determining how much weight is appropriate, must consider a host of factors, including the length, frequency, nature, and extent of the treatment relationship; the supportability and consistency of the physician's conclusions; the specialization of the physician; and any other relevant factors." *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007) (citation omitted); *see Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011) (quoting, in part, 20 C.F.R. § 404.1527(d)(2)).

"[T]he ALJ must provide 'good reasons' for discounting treating physicians' opinions, reasons that are ' sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Rogers*, 486 F.3d at 242 (quoting, in part, Soc. Sec. R. 96-2p, 1996 WL 374188, at *5 (July 2, 1996)).

**B.** **Drs. Songer, Perilman, and Polansky**

On remand from this Court, the Appeals Council reviewed ALJ Kenyon's first decision and identified several problems with it, starting with his review of Dr. Songer's opinions and continuing with his review of the opinions provided by Drs. Perilman and Polanksy. (Doc. #5, *PageID* #s 1194-95).

On remand from the Appeals Council, ALJ Kenyon issued the non- disability decision at issue in the present case. The ALJ again weighed Dr. Songer's opinions and gave them little weight. *Id*. at 1119. The ALJ noted that in March 2013 (1) Dr. Songer was Plaintiff's treating psychiatrist, (2) Dr. Songer indicated that significant stress often affected Plaintiff's sleep and made her more prone to affective instability, and (3) Dr. Songer said that Plaintiff exhibited poor frustration tolerance and difficulty concentrating.

8

*Id*. at 1118. The ALJ also recognized that, in April 2014, Dr. Songer believed Plaintiff had marked impairment in her ability to maintain attention and concentration for extended periods and set realistic goals or make plans independently of others. Dr. Songer found that Plaintiff had extreme limitation in her ability to perform activities within a schedule and maintain regular attendance, be punctual within customary tolerances, and complete a normal workday and workweek. And, as the ALJ correctly recognized, Dr. Songer thought Plaintiff would be absent from work more than three times per month due to her impairments. *See id*. at 1118-19, 485-88, 855-58.

The ALJ placed "little weight" on Dr. Songer's opinions "because the level of limitation he describes is in significant conflict with the claimant's day-to-day functioning." *Id*. at 1119. The ALJ also reasoned, "Dr. Songer's marked level limitations are both inconsistent with and not supported by his own treatment records which indicate that the claimant's bipolar complaints are sufficiently well controlled when she takes her medication as prescribed such that she is able to pursue complex past-times such as writing plays and significant social activities…." *Id*.

The ALJ failed to weigh Dr. Songer's opinions as the applicable law requires. Although it is not manifest, it appears that the ALJ started off on the right track by considering the treating-physician rule's legal criteria. This might be gleaned from his conclusions that Dr. Songer's opinions were both inconsistent with and not supported by his own treatment notes. But there is no indication that he gave meaningful thought to the length, frequency, nature, and extent of Dr. Songer's treatment relationship with Plaintiff or to the consistency of his opinions with the other medical source opinions of

9

record. *See Rogers*, 486 F.3d at 242. "[I]n all cases there remains a presumption, albeit a rebuttable one, that the opinion of a treating physician is entitled to great deference, its non-controlling status notwithstanding. *Id.* (citing and parenthetically quoting, Soc. Sec. Rul. 96–2p, 1996 WL 374188, at *4 ("In many cases, a treating physician's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."))

Even if this problem is set aside, the ALJ followed his previously flawed reasoning by focusing on what he believed the record said about Plaintiff's daily activities without reference to specific evidence and without addressing contrary evidence. *See* Doc. #5, *PageID* #1119. The Appeals Council explained this problem when reviewing the ALJ's first decision:

> The record indicates that the claimant is not always able to perform her activities of daily living. For instance, Dr. Songer's treatment notes indicate the claimant's "depression has been quite prominent and disabling," characterized by excessive sleep, lack of motivation to perform activities of daily living, and inability to look forward to activities that used to provide pleasure. In addition, the [ALJ's] decision does not specify the evidence that supports the finding that the claimant's bipolar complaints are sufficiently well controlled. The record instead indicates that even when compliant with medication, the claimant had depression characterized by crying spells, memory deficits, suicidal ideation, low energy, poor motivation and self-loathing."

*Id.* at 1194 (citations omitted).

The significance of the Appeals Council's findings regarding Dr. Songer's opinions is twofold. First, ALJ Kenyon's weighing of Dr. Songer's opinion (in his second decision) fails to contain a single citation to any specific portion of the psychiatrist's "own treatment notes" in support of his assertion that the same belie the

10

treating source's conclusions. *See id*. at 1119. As the Appeals Council rightfully concluded, this is a fatal flaw in ALJ Kenyon's opinion weighing. *See Cottingim v. Commissioner*, Case No. 3:14-cv-0012, 2015 WL 2383520, Report & Recommendations *9 (S.D. Ohio, May 19, 2016), *aff'd*, 2015 WL 3606838 (June 8, 2015) (citing *Friend v. Comm'r of Soc. Sec.*, 375 F. App'x 543, 551-52 (6th Cir. 2010)).

Second, the Appeals Council's decision highlights how ALJ Kenyon's current findings regarding Dr. Songer's opinions, like those he made previously, are not actually supported by the record's evidence. The evidence cited by the Appeals Council joins other evidence throughout the record to belie and otherwise render unsupported ALJ Kenyon's contentions that Dr. Songer's opinion is inconsistent with Plaintiff's daily activities or otherwise incongruent with the longitudinal contents of the psychiatrist's records. *See* Doc. #5, *PageID* #1194.

The Commissioner argues that the ALJ properly assessed and relied on Plaintiff's day-to-day activities when rejecting the medical sources' opinions. The Commissioner points out that earlier in his decision, the ALJ properly considered that Plaintiff was able to pursue complex activities such as writing plays and engaging in significant social activities. And the Commissioner emphasizes, as did the ALJ, that even on Plaintiff's bad days, she is able to engage in the mental-work activities identified in the ALJ's assessment of her residual functional capacity. These contentions lack merit. ALJ Kenyon neglected that the record readily reveals the same to be intermittent and subject to disruption secondary to the ebb and flow of Plaintiff's mental health symptoms. And, the ALJ paid no heed to Plaintiff's consistent testimony that her ability to engage in day-

11

to-day activities, including her writing and acting, is directly dependent upon the severity of her bipolar symptoms. The activities she identified—cooking, cleaning, and the like—can be too much for her when she is depressed. Similarly, the stress involved in acting can trigger her symptoms to the extent she must stop acting. This occurred, for example, when she had the lead role as Anna in <u>The King and I</u>. The ALJ provided no indication that he considered the evidence contrary to his conclusion about Plaintiff's day-to-day activities.

The ALJ also found that Plaintiff had a "typically euthymic mood." (Doc. #5, *PageID* # 1117)(citations omitted). While the record frequently documents her euthymic mood, this only comes when her prescription mental-health medications—which are numerous and strong (e.g., Lithium, Depakote, Serax, Asenipine) are efficacious. Moreover, the ALJ's reference to Plaintiff's typically euthymic mood tends to betray an incomplete understanding of bipolar disorder, which can involve extended periods of euthymic mood when treatment is successful. It is the nature of this disorder that it will at times be symptomatic (manic or depressive) and at times asymptomatic (euthymic) And there is little doubt that during her euthymic periods Plaintiff could perform some work and perhaps hold a temporary job. *Cf. Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (recognizing that a bipolar plaintiff who is "heavily medicated" could "cope with the challenges of daily living, and would doubtless enable her to work on some days."). Plaintiff could do so when she worked for her parents but only because her parents allowed her to be absent from work when she experienced debilitating symptoms. No employer would allow this in our modern economy, as the vocational expert explained.

12

(Doc. #5, *PageID* #96) (employers would not tolerate an individual absent three times per month; "Really employers would not tolerate anything more than one day [per month].")

Turning to the ALJ's weighing of Dr. Perilman's opinion, the ALJ wrote, "The undersigned gives little weight to the opinion of Dr. Perilman, as he is a family physician and not a mental health professional. Further, his responses to the Interrogatories are undercut by the claimant's documented level of day-to-day activity." *Id*. at 1119. The Appeals Council expressly and rightfully rejected this exact same criticism of Dr. Perilman's opinion from ALJ Kenyon's first decision:

> In addition, the decision afforded little weight to the opinion evidence provided by David Perilman, M.D. because he is a family physician and his opinion is undercut by the claimant's documented level of day-to-day activity (Decision, page 10). However, the evidence of record indicates the claimant was not able to perform her activities of daily living during depressive or bipolar episodes (Exhibit, 35F, page 92). In addition, Dr. Perilman's treatment records indicate he treated the claimant's bipolar disorder (Exhibits 24F, page 2; & 25F).

*Id*. at 1195. In rejecting these challenges to Dr. Perilman's opinions, the Appeals Council hit the nail squarely on the head. As far as Dr. Perilman being a family physician rather than "a mental health professional," this is not a reasonable basis for discounting the provider's opinion, particularly where he actively treated Plaintiff's mental health. *See Marcum v. Comm'r*, Case No. 3:15-cv-245, 2016 WL 4086984, at *6 Report & Recommendations (Aug. 2, 2016, S.D. Ohio), adopted 2016 WL 4440326 (Aug. 23, 2016).

The ALJ also gave little thought to opinions of treating podiatrist Dr. Polansky by weighing his opinions in just the following citation-less sentence: "The undersigned give

13

little weight to the opinion of Dr. Polansky because the record continues to show that the claimant has a normal gait." (Doc. #5, *PageID* #1119). The ALJ should have known this was insufficient because the Appeals Council not only had previously criticized ALJ Kenyon for not specifying evidence in support of his weighing of Dr. Polansky's opinions but had also specifically cited to medical evidence supportive of the physician's opinion that the ALJ had previously ignored and continues to do so. *Id*. Beyond being cursory and unsupported by citations, ALJ Kenyon's "normal gait" hypothesis is also unsustainable in that it is both unsupported by the record's evidence and not reasonably related to his rejection of Dr. Polansky's conclusions. Rather than consistently indicating a normal gait, the record instead reveals Plaintiff at least intermittently having gait abnormalities, at times even indicating that she was in a cast and/or using a walker. *See id*. at 343-45, 348, 352, 354-58, 500, 574, 590, 594, 594, 602, 608, 873, 878, 883, 1060, 1076, 1091, & 2004.

Even if Plaintiff's gait was consistently normal (which it was not), it is entirely unclear why this fact alone would merit entirely rejecting Dr. Polansky's opinions regarding Plaintiff's ability to stand and need to elevate her legs, particularly in the context of the other evidence severe foot problems cited by the Appeals Council.

Plaintiff next contends that ALJ Kenyon's weighing of the state agency's non-examining consultants' opinions rests on reversible error. She maintains that the ALJ did not apply the correct legal criteria to the opinions of Drs. Warren and Terry by not mentioning the applicable factors—supportability, consistency, and specialization.

"'The regulations provide progressively more rigorous tests for weighing opinions

as the ties between the source of the opinion and the individual become weaker.'" *Gayheart*, 710 F.3d at 375 (quoting Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2 (July 2, 1996)). The ties between Plaintiff, on one side, and Drs. Warren and Terry, on the other, fall at the weakest end of the spectrum because they were not treating physicians, examining physicians, or consulting physicians. "[O]pinions from nontreating and nonexamining sources are never assessed for 'controlling weight.' The Commissioner instead weighs these opinions based on the examining relationship (or lack thereof), specialization, consistency, and supportability, but only if a treating-source opinion is not deemed controlling. Other factors 'which tend to support or contradict the opinion' may be considered in assessing any type of medical opinion. *Gayheart*, 710 F.3d at 376 (citation omitted).

ALJ Kenyon assigned "partial weight" to the opinions of Drs. Warren and Terry, who reviewed the medical record in 2013. (Doc. #5, *PageID* #s 127-28, 110-12, 1120). Notably, the "partial weight" assigned to the opinions of these non-examiners is greater than the weight ALJ Kenyon assigns to the opinion of any of Plaintiff's four treating physicians. *See id.* at 1119-20. He explained:

> The undersigned gives partial weight to the assessments of these reviewers. The undersigned did not specifically limit the claimant to superficial social contacts, as that term is not defined by the Dictionary of Occupational Titles whereas occasional is defined. The above restriction from simple, repetitive tasks with no more than occasional contact with coworkers, supervisors, and the public, when considered together, are sufficient that any social contact the claimant would be compelled to have as part of her actual job duties would be sufficiently superficial. The claimant's theatre involvement is also inconsistent with their conclusions that the claimant could have only superficial social contact.

15

*Id*. at 1120.

ALJ Kenyon's discussion of the merits and scope of a restriction to superficial social contact avoids referencing a substantive reason for placing partial weight on these Drs. Warren's and Terry's opinions. Without some explanation of why he placed more weight on their opinions than on the opinions of Plaintiff's treating sources, the ALJ erred. "A more rigorous scrutiny of the treating-source opinion than the nontreating and nonexamining opinions is precisely the inverse of the analysis that the regulation requires." *Gayheart*, 710 F.3d at 379 (citing, in part, Soc. Sec. Rul. No. 96–6p, 1996 WL 374180, at *2).

Accordingly, for the above reasons, Plaintiff's Statement of Errors is well taken.[2]

## V. **Remand**

A remand is appropriate when the ALJ's decision is unsupported by substantial evidence or when the ALJ failed to follow the Administration's own regulations and that shortcoming prejudiced the plaintiff on the merits or deprived the plaintiff of a substantial right. *Bowen*, 478 F.3d at 746. Remand may be warranted when the ALJ failed to provide "good reasons" for rejecting a treating medical source's opinions, *see Wilson*, 378 F.3d at 545-47; failed to consider certain evidence, such as a treating source's opinions, *see Bowen*, 478 F.3d at 747-50; failed to consider the combined effect of the plaintiff's impairments, *see Gentry v. Comm'r of Soc. Sec.*, 741 F.3d 708, 725-26 (6th Cir. 2014); or failed to provide specific reasons supported by substantial evidence for

---

[2] In light of the above discussion, and the resulting need to remand this case, an in-depth analysis of Plaintiff's other challenges to the ALJ's decision is unwarranted.

16

finding the plaintiff lacks credibility, *see Rogers*, 486 F.3d at 249.

Under sentence four of 42 U.S.C. § 405(g), the Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." *Melkonyan v. Sullivan*, 501 U.S. 89, 99 (1991). Consequently, a remand under sentence 4 may result in the need for further proceedings or an immediate award of benefits. *E.g., Blakley*, 581 F.3d at 410; *Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994). The latter is warranted where the evidence of disability is overwhelming or where the evidence of disability is strong while contrary evidence is lacking. *Faucher v. Sec'y of Health & Human Servs.*, 17 F.3d 171, 176 (6th Cir. 1994).

A judicial award of benefits is warranted in the present case because the evidence of disability is strong while contrary evidence is lacking. This is, moreover, an unusual case considering the fact that a remand for further proceedings would require a third decision by an Administrative Law Judge (unless the Appeals Council remanded for benefits). In these circumstances and given the strong evidence of disability while contrary evidence is lacking, there is no just reason to further delay this matter for even more administrative proceedings. *See Gentry*, 741 F.3d at 730 (remanding for benefits after 2 remands and 3 administrative hearings and finding, "In light of the extensive opinions of treating physicians as to the severity of Gentry's psoriasis and psoriatic arthritis, we conclude that substantial evidence on the record as a whole supports a finding of total disability."); *see also Benecke v. Barnhart*, 379 F.3d 587, 595 (9th Cir. 2004) ("Allowing the Commissioner to decide the issue again would create an unfair 'heads we win; tails, let's play again' system of disability benefits adjudication." (other

17

citation omitted)); *Wilder v. Apfel*, 153 F.3d 799, 804 (7th Cir. 1998) ("Given the obduracy evidenced by the action of the administrative agency on remand, we remand the case to the agency with directions that the application for benefits be granted."); *Randall v. Sullivan*, 956 F.2d 105, 109 (5th Cir. 1992) ("Because of the medical record, we think it unconscionable to remand this eight year old case to the Secretary for further review.").

**IT IS THEREFORE RECOMMENDED THAT**:

1. The Commissioner's non-disability finding be vacated;

2. This matter be **REMANDED** to the Social Security Administration under sentence four of 42 U.S.C. § 405(g) for payment of benefits; and

3. The case be terminated on the Court's docket.

August 6, 2019 *s/Sharon L. Ovington*
Sharon L. Ovington
United States Magistrate Judge

## NOTICE REGARDING OBJECTIONS

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within **FOURTEEN** days after being served with this Report and Recommendations. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation is based in whole or in part upon matters occurring of record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within **FOURTEEN** days after being served with a copy thereof.

Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See Thomas v. Arn*, 474 U.S. 140 (1985); *United States v. Walters*, 638 F.2d 947, 949-50 (6th Cir. 1981).